## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

BRADLEY BARBER,          )
                          )
      Plaintiff,        )
                          )
v.                         )
                          )       2:07-cv-00012-JEO
BRASFIELD & GORRIE, INC., HOAR  )
CONSTRUCTION, LLC, B.L. HARBERT  )
INTERNATIONAL CONTRACTORS, LLC,  )
and OPUS SOUTH, INC.,     )
                          )
      Defendants.     )

## <u>MEMORANDUM OPINION</u>

This case is before the court on the defendants', B.L. Harbert International, LLC ("Harbert"), Brasfield & Gorrie, Inc. ("B&G"), Hoar Construction, LLC ("Hoar"), and Opus South, Inc. ("Opus"), (collectively "the defendants") motions to dismiss (docs. 18, 19, 20, and 22),[1] as well as the plaintiff's motion to file a second amended complaint[2] (doc. 25).[3]  For the reasons set out herein, the court finds that the plaintiff's motion to amend the complaint is due to denied as futile and the defendants' motions to dismiss are due to be granted.

## I.   BACKGROUND

The plaintiff, Bradley Barber, is a *qui tam* relator who brought this action on behalf of the United States against the defendants, all of whom are construction contractors.  In the initial

---

[1]Each defendant submitted its own motion to dismiss, but defendants B&G, Harbert, and Hoar submitted one collective brief in support of their motions (doc. 21).  Opus filed a separate brief (doc. 22), which adopts and incorporates the arguments made by the other defendants and contains some additional argument particular to that defendant.

[2]The proposed second amended complaint is attached to the motion at exhibit A.  The court will refer to the second amended complaint as "SAC" herein.

[3]References herein to "Doc. ___" are to the electronic document numbers assigned by the Clerk of the Court and located at the top of each document.

complaint, the plaintiff alleged that the defendants (1) violated the federal False Claims Act by failing to submit payroll certifications under the Davis-Bacon Act[4] and (2) are liable under the federal Racketeer Influenced Corrupt Organizations ("RICO") Act by virtue of the alleged employment of illegal aliens by various subcontractors.  The plaintiff further seeks class certification.  (Doc. 1).  The plaintiff has also filed a "First Amended Complaint" (doc. 7), and now seeks to file a second amended complaint ("SAC") (doc. 25-2).  The United States has declined to intervene in this action.  (Doc. 9).

## II.     STATEMENT OF FACTS[5]

Each of the defendants are general contractors and have operated independent of one another as the general contractors on four projects listed in the plaintiff's second amended complaint: the University of Alabama at Birmingham North Pavilion Hospital; the Shelby Biomedical Interdisciplinary Center at the University of Alabama Birmingham; the UAB Recreational Center; and the Social Security Administration Building.  (SAC at ¶ 23).  In each of the building projects, the general contractors hire subcontractors to perform various functions in the construction process.  (SAC at ¶ 24).  According to the plaintiff, many of the subcontractors hired by the defendants, particularly the masonry subcontractors, regularly employed illegal alien workers on the projects at issue.  (SAC at ¶¶ 25-27).

The plaintiff further alleges that the defendants were aware of the hiring of illegal

---

[4]In his first two complaints, the plaintiff asserts False Claims Act claims against all the defendants.  However, in his proposed second amended complaint, the plaintiff only asserts a False Claims Act claim against defendant Opus.  The amended claim states that Opus submitted false claims certifying that its workers were paid the prevailing wage rate when, in fact, they were paid less.

[5]The facts are set out in a light most favorable to the plaintiff and are taken from the plaintiff's first and second amended complaints.

workers on the projects and did nothing to prevent it.  (SAC at ¶ 33).[6]  In support of these claims, the plaintiff asserts that: (1) the subcontractors on all of the projects not only hired illegal workers, but brought in undocumented workers from other states, which was known to each defendant (SAC at ¶¶ 33-34); (2) each defendant accepted contracts from subcontractors they knew hired primarily, if not exclusively, illegal workers (SAC at ¶ 40); (3) the defendants benefitted from this conduct because "the subcontractors were able to submit bids below what they would have to bid them for, and the defendants reap the benefits of their artificially low bids" (SAC at ¶ 40); and, (4) while each of the defendant general contractors know of this activity, they "are happy to participate because they are able to bid projects at a lower rate, but keep margins steady because the subcontractor bids are below what they would have to be if said subcontractors hired a legal workforce."  (SAC at ¶ 40).

Furthermore, the plaintiff alleges that these illegal aliens are brought into the country by a "coyote" who is directed by the subcontractors to bring illegal workers to the construction sites. (SAC at ¶ 9).  In addition to paying the illegal workers' wages, the subcontractors aid the "coyote" in providing housing for the illegal workers.  (SAC at ¶ 11).  The subcontractors at each of the defendants' construction sites have hired hundreds of individuals they knew to be aliens on a continuous basis.  (SAC at ¶ 12).[7]

The plaintiff is aware of these activities from having sought work as a brick mason at each of the construction sites.  (SAC at ¶ 25).  The extent of the plaintiff's knowledge as to each

---

[6]As far as the court can discern, the individual defendants have no connection to each other.

[7]The plaintiff's initial complaint and the first amended complaint do not contain any of the "coyote" type allegations that are found in the SAC.  Instead, the plaintiff only alleged that the subcontractors hired illegal workers and aided them in assimilating into the economy, thereby shielding them from detection and harboring illegal aliens who have illegally entered the United States.  (Compare Doc. 1, Doc. 17 at ¶ 58, and Doc. 25 at ¶¶ 9-12).

of the work sites is as follows:

a.  The UAB Recreation Center - the plaintiff worked for subcontractor XCEL Masonry on this project.  He was not paid the "Davis-Bacon mandated wages."  He questioned the workers giving false credentials for employment purposes and "observed workers give social security numbers that they kept, written on box tops, with no other documentation, for the purposes of supplying a social security number to complete the mandated I-9 form.  When the plaintiff asked XCEL personnel what it did when and if it was notified by the IRS that the social security numbers were improper, he was told that it simply gives authorities newly created XCEL names and social security numbers.  (SAC at ¶ 26b).

b.  The plaintiff visited the site of Shelby Biomedical Center several times and sought employment with subcontractor Masonry Arts at the site.  (SAC at ¶ 26c).

c.  The plaintiff applied for work on the Social Security Administration project through subcontractor Heritage Masonry.  He later went to the site and observed only illegal aliens as workers.  He knew they were illegal because they were "confirmed to be unauthorized workers on other projects" and he recognized them.  The plaintiff later learned that Masonry Arts had replaced Heritage and attempted to apply with them but they would not accept his application.  He later viewed the site and "personally witnessed workers he knew to be unauthorized hired by Masonry Arts . . . [i]n fact, [he] took photographs of work at the site, and was assaulted by Opus employees who tried to wrestle [his] camera from his grasp . . . [in] an obvious attempt . . . to hide this continuing practice of knowingly contracting with subcontractors who hire illegal workers."  (SAC at ¶ 26d).

d.  The plaintiff worked as a mason at the UAB North Pavilion Hospital Project.  (SAC at

4

¶ 26e).

The plaintiff further alleges that he has witnessed the hiring of illegal workers by the subcontractors and that the "coyotes" arrange for the workers to be transported to the country, arrange for housing on behalf of the illegal workers, and transport the workers en masse from their apartments to the job sites.  (SAC at ¶ 34).  The plaintiff has also witnessed telephone calls made "'downstream', to transport in more workers, ultimately from border towns."  (SAC at ¶ 33).

## III.     STANDARD OF REVIEW

In assessing the merits of the defendants' motion, which was filed, in part, pursuant to Federal Rule of Civil Procedure 12(b)(6), the court begins with the premise that the complaint generally need not contain anything more than "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  It simply must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atlantic Corp. v. Twombly*, ___U.S.___, 127 S. Ct. 1955, 1969, 167 L. Ed. 2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).  "To survive a motion to dismiss, plaintiffs must do more than merely state legal conclusions; they are required to allege some specific factual bases for those conclusions or face dismissal of their claims."  *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1263 (11th Cir. 2004) ("[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal.").  So long as the factual allegations in the complaint "raise a right to relief above the speculative level," the complaint will withstand a 12(b)(6) challenge.  *Twombly*, 127 S. Ct. at 1965.  In assessing the motions, the court must also assume that all well-pleaded

5

allegations in the complaint are true.  *Twombly*, 127 S. Ct. at 1965.  Additionally, "in all

averments of fraud . . . , the circumstances constituting fraud . . . shall be stated with

particularity."  *United States ex Rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th

Cir. 2002) (quoting FED. R. CIV. P. 9(b)).

## IV.   ANALYSIS

### A.   THE FALSE CLAIMS ACT CLAIMS ARE DUE TO BE DISMISSED

The False Claims Act ("FCA") allows individuals ("relators") to bring a claim against

and recover damages on the behalf of the United States from any person who "knowingly

presents, or causes to be presented, to an officer or employee of the United States Government

. . . a false or fraudulent claim for payment or approval," or "knowingly makes, uses, or causes to

be made or used, a false record or statement to get a false or fraudulent claim paid or approved by

the Government."  31 U.S.C. § 3729(a)(1) and (2).  The FCA imposes a high threshold for

culpable "intent" because the statute is designed to punish circumstances in which "the defendant

possessed guilty knowledge or guilty intent to cheat the government."  *United States v. Thomas*,

709 F.2d 968, 972-73 (5th Cir. 1983) (citing *United States v. Gardner*, 73 F. Supp. 644 (N.D.

Ala. 1947)).[8]

Rule 9(b)'s directive that "the circumstances constituting fraud and mistake shall be

---

[8]In his second amended complaint, the plaintiff only asserts a claim under the FCA against defendant Opus.  The court deems this, as well as the plaintiff's statement in his brief in reply to the defendants' motions to dismiss as a voluntary dismissal of the FCA claims against B&G, Hoar, and Harbert.  Specifically, the plaintiff acknowledged:

It should be noted that Plaintiff deleted [the false claims act claims as to B&G, Hoar, and Harbert] without any motion requiring analysis of the evidence being filed.  In other words, as soon as it became apparent that . . . the projects . . . were not subject to Davis-Bacon requirements, these claims were dropped. . . .  Such is consistent with Plaintiff's counsel's . . . duty to the Court in dismissing claims as soon as it became apparent that sufficient evidentiary basis to continue to litigate those claims was not in the record.

(Doc. 30 at p. 22).  Even if the plaintiff had not conceded these claims, the court would have found them due to be dismissed based upon the defendants' meritorious arguments in their brief in support of their motions to dismiss.

stated with particularity" does not permit a False Claims Act plaintiff to state a claim by

*speculating* that a false claim may have been submitted to the Government.  *Clausen*, 290 F.3d at

1311.  The plaintiff must present more than the mere assertion that a defendant has caused a false

claim to be presented.  *See Hall v. Bellmon*, 935 F.2d 1106, 1109-10 (10th Cir. 1991)

("conclusory allegations without supporting factual averments are insufficient to state a claim on

which relief can be based.").  Even in circumstances where allegations of fraud may be based on

information and belief because the facts are peculiarly within the opposing party's knowledge,

Rule 9(b) continues to require the complaint to "set forth the factual basis for the plaintiff's

belief."  *Koch v. Koch Industries*, 203 F.3d 1202, 1237 (10th Cir. 2000).

> The Eleventh Circuit has specifically held:

> Those bringing claims on behalf of the government under the False Claims Act for
> fraudulent claims must plead "facts as to time, place, and substance of the
> defendant's alleged fraud, specifically the details of the defendants' allegedly
> fraudulent acts, when they occurred, and who engaged in them.  The directive to
> plead with particularity does not permit a False Claims Act plaintiff merely to
> describe a private scheme in detail but then to allege simply and without any
> stated reason for his belief that claims requesting illegal payments must have been
> submitted, were likely submitted or should have been submitted to the
> Government.

*Mitchell v. Beverly Enterprises*, 248 Fed. Appx. 73, 74 (11th Cir. 2007).  And, although plaintiffs

"need not prove their allegations in the complaint," they must plead facts with enough

particularity so that the court can distinguish "mere conjecture" from "a specifically pleaded

allegation on an essential element of the lawsuit."  In finding a complaint due to be dismissed for

lack of particularity, this court has also reasoned:

> General averments do not suffice, no matter how difficult it may be for a relator to
> meet the stringent requirement of particularity without first obtaining court aided
> access to discovery materials from defendant.  This is the clear lesson from the

Eleventh Circuit in *U.S., ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301 (11th Cir. 2002). The same lesson was even more recently taught by the First Circuit in *U.S., ex rel. Karvelas v. Melrose-Wakefield Hospital*, 360 F.3d 220 (1st Cir. 2004), which cited *Clausen*, and as to which the Supreme Court denied certiorari on October 4, 2004. The federal courts are increasingly reluctant to allow fishing expeditions by whistle-blowers employing the FCA and hoping for federal intervention. The whistle must be blown not only loudly, but with Rule 9(b) particularity in the complaint before the courts will listen.

*United States ex rel. Atkins v. McInteer*, 345 F. Supp. 2d 1302, 1305 (N.D. Ala. 2004).

In the instant case, the extent of the facts relating to the alleged submission of false claims are as follows:

4. Defendant Opus South is a contractor on a qualifying Davis-Bacon Act Project listed herein. Each Defendant in this case knew that the subcontractors on the jobs listed below hire illegal aliens perform work [sic] on the projects contained in this action, and pay them at rates beneath the prevailing rates required by the Davis-Bacon Act and lower than the market would dictate if there were not a glut of illegal workers in the labor market. Opus South and its subcontractors certify, upon requesting payment for these workers, that the workers are paid at the prevailing rates as required by law.

. . . .

6. . . . As outlined below, hundreds of false claims for payments have been made to pay illegal aliens at wages below the prevailing rates on the projects outlined herein. Each such false certification creates its own liability subject to the civil penalties related above.

. . . .

26. Mr. Barber has personal knowledge of the systematic hiring of illegal aliens, and the failure to pay them the prevailing rate, as required by law as follows.

. . . .

d. Mr. Barber sought employment on the Social Security Administration project in April/May of 2006. Mr. Barber applied with Heritage Masonry, who was to be the masonry subcontractor on the

project.  Mr. Barber got this information from a
telephone conversation with Opus South personnel
in Atlanta, Georgia.  Mr. Barber applied to work as
a journeyman mason on the project the next day.
He was told that he would be contacted.  Two
weeks later, Mr. Barber went by the site and
observed that Heritage Masonry was on-site using
only illegal/unauthorized aliens as workers.  Mr.
Barber knew that there were unauthorized workers
because these workers were confirmed to be
unauthorized workers on other projects.  Mr. Barber
recognized these workers by sight.  Mr. Barber was
not hired because of Heritage Masonry's policy,
known to Opus South, to only hire
illegal/unauthorized workers.

At a later date, Mr. Barber learned that Masonry Arts had
replaced Heritage as the masonry subcontractor on the
Social Security Administration project.  Mr. Barber sought
employment with Masonry Arts, and Masonry Arts would
not even accept his application.

Mr. Barber viewed the site as recently as January of 2008,
wherein he personally witnessed workers he knew to be
unauthorized hired by Masonry Arts, who was by now the
masonry contractor for Opus South.  In fact, Mr. Barber
took photographs of work at the site, and was assaulted by
Opus employees who tried to wrestle Mr. Barber's camera
from his grasp.  This was an obvious attempt by Opus
personnel to hide this continuing practice of knowingly
contracting with subcontractors who hire illegal workers at
sub-legal wages, passing along this savings to Opus South
in the form of artificially low bids and depriving
subcontractors who follow the law of an opportunity to
submit competitive bids.  Because of the practice of hiring
subcontractors who hire illegal masonry work, Mr. Barber
has been unable to work on this project.

        . . . .

        29.    Subcontractors on each of the construction projects at issue
knowingly sign false I-9 "Employment Eligibility Verification" forms for illegal,
undocumented workers.  By signing the form, employers certify "under penalty of

perjury, that to the best of my knowledge, this employee is eligible to work in the United States . . . the document(s) examined appear to be genuine, originals, and relate to the individual."

. . . .

37.     Mechanically, for the Social Security Administration project, Davis-Bacon Act certifications for weekly payroll (forms 347 and 348) are sent to the local contract administrator, who, in turn, verifies payroll and authorizes the release of federal funds for payment.

38.  On the Social Security Act project, the payroll submissions of subcontractors are taken, in turn, by the defendant general contractors, and certified to the United States government's Local Contracting Authority as certifications of the workers who actually have been employed on the project. Monies are disbursed to the general contractors to pay the subcontract employees their wages at the prevailing rate, even though both contractors and subcontractors know these certifications include undocumented workers who are not paid the prevailing rate.  This false certification has taken place weekly from the beginning of the work in the fall of 2005 to the present, each time constituting a false claim requesting payment.

. . . .

b.     The contract between Opus South and the General Services Administration has been administratively determined to be governed by the Davis-Bacon Act requirements, meaning that the various classes of laborers and mechanics must be paid based upon the wages determined by the Secretary of Labor to be prevailing for the corresponding classes of laborers and mechanics.  40 U.S.C. § 276a(a)[9] [now 40 U.S.C. § 3142(b)].

c.     The Davis-Bacon Act requires that payment be made to the covered laborers and mechanics on a weekly basis, in the amount determined to be the prevailing rate.

d.     The contractors must make payment once a week, and must also certify their compliance with the pertinent provisions of the act, i.e., that the subcontractors' employees are paid the prevailing wage rate, on a weekly basis.

---

[9]40 U.S.C.A. § 276 was repealed and replaced with 40 U.S.C.A. §§ 3141-48, effective September 27, 2006.

10

e.      The United States Code provides that the Secretary of Labor may make regulations for the implementation of the act, and that "each contractor and subcontractor shall furnish weekly a statement with respect to the wages paid each employee during the proceeding [sic] week."  40 U.S.C. § 276c [now 40 U.S.C. § 3145][10].

f.      In addition . . . weekly payrolls must be sent to the contracting agency, or the agency's representative, stating that each laborer or mechanic has been paid the full weekly wages according to the prevailing wage rate . . .  The general contractor is responsible for the submission of all copies f [sic] payrolls by all subcontractors.

g.      . . . each payroll submitted must contain a "Statement of Compliance" . . .

. . . .

I.      Each week, Opus, through its duly appointed agent, has submitted a certification, as required above that all laborers and mechanics have been paid the prevailing wage rate, with no deductions.

j.      These certifications were not true, and Opus knew they were not true, because it knew that the masonry subcontractors, and on information and belief, other subcontractors, hired primarily, if not exclusively, illegal workers, and paid the personnel who did the work less than the prevailing wage rate.

. . . .

39.    The moneys then come to the subcontractors, who do not pay the undocumented workers the prevailing rate, or at the rate they would have to pay American workers, but pay them at rates far below that which is required, or that a legal market would create for labor.

---

[10]The regulation reads:

    (a) In general.  - -  The Secretary of Labor shall prescribe reasonable regulations for contractors and subcontractors engaged in constructing, carrying out, completing, or repairing public buildings, public works, or buildings or works that at least partly are financed by a loan or grant from the Federal Government.  The regulations shall include a provision that each contractor and subcontractor each week must furnish a statement on the wages paid each employee during the prior week.

40 U.S.C. § 3145(a).

. . . .

56.    As referenced above, Opus South must certify on its weekly payroll requests for the Social Security Administration project referenced herein that all mechanics and laborers are to be paid the prevailing rate as set by the Department of Labor for the area.

57.    The certifications may have been made by the subcontractors, and then merely forwarded to the Local Contracting Authority (The United States Government) by the defendant subcontractors.  However, this process is irrelevant for purposes of a claim under the False Claims Act.  The Davis Bacon Act states that the contractor shall assure payment according to the prevailing rates of all laborers and mechanics employed by contractors **and** subcontractors on the project.

58.    The Davis Bacon Act, at 40 U.S.C. §276c authorizes regulations to implement the Act's provisions.  These regulations state that each payroll submitted shall be accompanied by a "Statement of Compliance" signed by the contractor or subcontractor certifying, "That each laborer or mechanic has been paid not less than the applicable wage rates."  29 C.F.R. § 5.5(a)(3)(ii)(B).

59.    The regulations go on to state that, "The falsification of any of the above certifications may subject the contractor or subcontractor to civil or criminal prosecution under . . . §231 of Title 31 of the United States Code."  29 C.F.R. § 5.5(a)(3)(ii)(D).  Because Opus South knew that its subcontractors, including the masonry subcontractors referenced herein, have illegal work focus that are paid less than the applicable wage rate, the certification that they have been paid the prevailing wage rate are false [sic].

(SAC).  Although the plaintiff's false claims act claim is lengthy, it is short on factual

allegations, and many of those that are enumerated are wholly conclusory.  In fact, the plaintiff

makes assertions with far less particularity in his complaint than the Eleventh Circuit has already

held to be inadequate.

For example, in *Clausen*, the plaintiff, who described himself as a competitor of the

defendant corporation, alleged facts in support of his false claims act claims that included

references to conversations had with two named employees of the defendant about the company's

policies and procedures, specific descriptions of medical tests and codes used for medical tests that were allegedly put on the false claims and a reference to the specific form that would have been submitted to Medicare, and the testing histories of three identified patients as examples of the types of claims that would have been submitted to the government. *Clausen*, 290 F.3d at 1304-05. Additionally, the plaintiff in that case attached a blank claim form that the defendants would have used to submit their false claim, as well as a table of medical test codes. The court noted that, "still no copies of a single actual bill or claim or payment were provided. No amounts . . . were identified. No actual dates of claims were alleged. Not a single completed Form 1500 was provided. No policies about billing or even second-hand information about billing practices were described, other than to state [which forms and codes] were used." *Id*. at 1306. The court went on to note that, "[a]t most, Clausen's complaints raise questions about LabCorp's internal testing policies. But nowhere in the blur of facts and documents assembled . . . can one find any allegation, stated with particularity, of a false claim actually being submitted to the Government." *Clausen*, 290 F.3d at 1312.

Likewise, in *Mitchell*, the plaintiff alleged that the defendant submitted claims to Medicare for services that were not rendered, for reimbursement in excess of what it was entitled, and for services that were not medically necessary. 248 Fed. Appx. at 75. The court found the following allegations lacked the requisite particularity and reliability to meet the standard under Rule 9(b) for complaints under the False Claims Act:

> [a]lthough the complaint alleges "Mitchell observed and participated in a billing process," [he] provided specific facts only about the therapists' billing logs, not the actual claims presented . . . As an attachment to the complaint, [he] provided a page from one therapist's billing log for [a patient] . . . [but] failed to assert any specific facts beyond [the patient's] family's allegations as to the accuracy of the

> billing log, and he failed to assert any specific facts regarding the actual
> submission of the claim to Medicare. He states "[t]he therapists would complete
> [billing log] forms, take the forms to the [administrator], and then have that
> information entered and sent directly to [Medicare] . . . He does not go past
> pleading "*his belief* that claims requesting illegal payments must have been
> submitted or should have been submitted to the Government" by alleging specific
> facts as to who submitted the bills . . ., how they were submitted, or even when
> they were submitted. *See Clausen*, 290 F.3d at 1311 (emphasis added).
> "Underlying improper practices alone are insufficient to state a claim under the
> False Claims Act absent allegations that a specific fraudulent claim was in fact
> submitted to the government." *Corsello*, 428 F.3d at 1014.

*Mitchell*, 248 Fed. Appx. at 75.

In the instant case, the plaintiff does not have any insider information about record

keeping or about specific claims that may have been made. Instead, his false claims act claim is

based entirely on speculation and deduction. The plaintiff first presumes that the subcontractors

doing work for Opus South have hired illegal/unauthorized workers because "they were

confirmed to be illegal on other job sites that he had experience with." (Second Amended

Complaint at ¶ 26(d)). From that presumption, the plaintiff concludes that Opus South has made

false claims because they are required to certify their compliance with the Davis-Bacon Act

weekly. The only "facts" that the plaintiff sets out are

> that Opus South is the contractor . . . ; that the project is subject to Davis-Bacon
> Act requirements; that as part of that process, Opus South submits certifications
> that it and its subcontractors have paid all applicable workers the prevailing wage
> rate; that Opus South has certified weekly since October of 2005 that all of its
> employees and subcontractor employees have been paid the prevailing wage rate;
> that Opus South made those certifications, via the submission of form 348 with
> the knowledge that its subcontractors, including the masonry subcontractors
> specifically referenced in this case, hire illegal workers that are not paid the
> prevailing wage rate."

(Doc. 26 at pp. 36-37)(citations omitted).

Based upon Eleventh Circuit precedent, the plaintiff's allegations fall short of the

14

required specificity.  The plaintiff's complaint fails to support the 'who,' 'what,' 'where,'

'when,' and 'how,' of improper practices *as well as* the 'who,' 'what,' 'where,' 'when,' and

'how,' of the actual alleged fraudulent submissions to the government.  *See Corsello*, 428 F.3d at

1014.  The plaintiff attempts to refute this by asserting: (1) that the "precise false claims have

been plead," through the statement that Opus South is to submit a weekly statement of

compliance on the form 348 (which was apparently supposed to be attached to the second

amended complaint but was not; however its omission has no bearing on the outcome of the

case); (2) that he has adequately plead the time ("weekly"), place ("to the GSA contracting

officer on site"), and person responsible ("person responsible for filling out the Form 348s); and

(3) that the content and manner in which the false statements were made is specifically alleged.

(Doc. 26 at pp. 38-41).  However, the plaintiff's assertions clearly disregard standing Eleventh

Circuit precedent.  As stated in detail herein, Rule 9(b) specificity requires actual dates on the

submitted forms, along with actual names of the people that submitted them, and actual amounts

of the false claims.  This, the plaintiff has not done. Application of the cases discussed herein to

the plaintiff's amended complaint makes it clear that the facts pled in the second amended

complaint are insufficient.  As such, the plaintiff's second amended complaint on this claim

would be futile.[11]

### B.       THE PLAINTIFF'S  RICO CLAIM IS DUE TO BE DISMISSED

 Pursuant to 18 U.S.C. § 1962(c), it is illegal "for any person employed by or associated

with any enterprise engaged in, or the activities of which affect, interstate commerce, to conduct

---

[11]The court also notes that Opus cites additional reasons in this brief as to why the false claims act claims are due to be dismissed against them, *i.e.*, it owns the building in question, rather than the government, and the plaintiff's claims are more properly brought against the subcontractors, if anybody.  The court has not examined the merits of these assertions, but instead has considered only those "facts" as asserted by the plaintiff for the purposes of this motion.

or participate, directly or indirectly, in the conduct of such enterprises' affairs through a pattern

of racketeering activity . . . ." 18 U.S.C. § 1962(c). "[I]n order to establish a federal civil RICO

violation under § 1962(c), the plaintiffs 'must satisfy four elements of proof: (1) conduct (2) of

an enterprise (3) through a pattern (4) of racketeering activity.'" *Williams v. Mohawk Industries,*

*Inc.*, 465 F.3d 1277, 1282 (11th Cir. 2006) (quoting *Jones v. Childers*, 18 F.3d 899, 910 (11th

Cir. 1994) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S. Ct. 3275, 3285, 87

L. Ed. 2d 346 (1985))). Additionally, in civil cases RICO plaintiffs must also meet the

requirements of 18 U.S.C. § 1964(c), which states that "'[a]ny person injured in his business or

property by reason of' RICO's substantive provisions has the right to 'recover threefold the

damages he sustains[,]'" but he must show (1) injury to "business or property," and (2) that such

injury was "by reason of" the substantive RICO violation. *Mohawk*, 465 F.3d at 1282. The court

will address these requirements as they relate to the plaintiff's proposed second amended

complaint.

### 1.     Pattern of Racketeering Activity

To succeed on a civil RICO claim, the plaintiff must prove a pattern of "racketeering

activity." *Mohawk*, 465 F.3d at 1283. "A pattern of racketeering activity, for purposes of the

RICO Act, requires at least two acts of racketeering activity." *Id*. "An act of racketeering is

commonly referred to as a 'predicate act.' A 'pattern' of racketeering activity is shown when a

racketeer commits at least two distinct but related predicate acts." *Id*.

The term "racketeering activity" is very specifically defined in 18 U.S.C. § 1961(1) as any

one of the enumerated acts listed in subparagraphs (A) through (G). In the instant case, the

plaintiff alleges a violation of § 1961(1)(F), which includes as "racketeering activity" "any act

16

which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens) . . . if the act indictable under such Act was committed for the purpose of financial gain."  18 U.S.C. § 1961(1)(F).

Specifically, the plaintiff alleges that certain subcontractors, with the defendants' knowledge, have: (1) transported aliens within the United States for the purpose of illegally working, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii); (2) concealed or harbored or shielded from [detection] such aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(iii); (3) encouraged aliens to come into the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(iv); (4) knowingly hired, during a twelve month period, at least ten individuals that they know are unauthorized aliens, and that they know have been brought into the United States in violation of § 1324(a)(3)(A); and (5) conspired with "coyotes" and others who bring in aliens, transport aliens, and house aliens to work in the United States, as well as aided and abetted the "coyotes" by providing the ultimate workplace for those who have been illegally brought into the United States, illegally transported through the United States, and harbored, through the provision of housing, in Birmingham and around the country, in violation of § 1324(a)(1)(A)(v)(I) and (II).  (SAC at ¶ 66(a)-(e)).  For the purposes of this motion, the court finds these allegations sufficient to establish a "pattern of racketeering activity."  However, the plaintiff has failed to allege that the defendants committed any of these predicate acts, or are otherwise "racketeers, or engaged in the racketeering activities."  Alleging conspiracy and aiding and abetting theories without more simply is insufficient as a matter of law.

While the plaintiff argues that "[t]here is no requirement that any particular defendant committed the actual predicate acts," the authority used in support of his contention is easily

distinguishable from the facts alleged in the plaintiff's complaints.  Most notably, the portion of

the *Carter* court's opinion that the plaintiff relies on concerns whether the enterprise (a dairy

farm) and the racketeering activity (drug smuggling and bribery) were sufficiently linked to

establish a RICO conspiracy.  *United States v. Carter*, 721 F.2d 1514, 1527-1531 (11th Cir.

1984).  In finding that a sufficient nexus existed, the court noted that the Government was able to

establish that: (1) an airstrip was constructed on a pasture on the dairy farm that was used for

bringing in shipments of drugs; (2) the dairy farm office was used for communications between

conspirators concerning protection of the drug smuggling activities from law enforcement;

(3) dairy farm workers participated in the drug smuggling and protection activities; and (4) drugs

were stored in a house on the dairy farm prior to distribution.  *Carter*, 721 F.2d at 1526.[12]

The plaintiff attempts to liken the dairy farm defendants' activity with the general

contractors in the instant case to establish "'proof that the facilities and services of the enterprise'

(in this case the combination of the general contractors and subcontractors in the construction

projects at issue) 'have been regularly and repeatedly used' to accomplish the racketeering

activity, which is the hiring and harboring of illegal workers." (Doc. 30 at p. 10 (quoting *Carter*,

721 F.2d at 1527)).  This the plaintiff has failed to do.  The most the plaintiff alleges against the

defendants, taken in the light most favorable to the plaintiff, is that the defendants were aware of

the subcontractors' racketeering activity.  The plaintiff has not made a single allegation that the

defendants were involved.  The plaintiff simply cannot establish a sufficient nexus between the

defendant contractors and the alleged predicate acts, even as alleged in the second amended

---

[12]Barber classifies the dairy farm involvement as "only operat[ing] the airstrip and dairy farm where the activities took place, for a fee." (Doc. 30 at p. 10).  However, that is an understatement of the dairy farm defendants' involvement in the activity, as set out above.

complaint.  Therefore, the court declines to allow the second amended complaint as it is futile.

Although the court need not address the remainder of the plaintiff's bases for establishing a

RICO claim, the court also finds that the second amended complaint falls short of establishing

that the defendants were engaged in an enterprise for the reasons set out below.

### 2. The Plaintiff Fails to Allege the Defendants' Involvement in a RICO "Enterprise"

Additionally, the court finds that the plaintiff's RICO "enterprise" allegations also fail as

a matter of law.  To satisfy the "enterprise" element of a RICO claim, the plaintiff must show that

the predicate acts occurred through the "conduct of an enterprise," "that the enterprise had a

common goal," and that the defendants "participate[d] in the operation or management of the

enterprise itself."  *Mohawk*, 465 F.3d at 1283-84.  The RICO enterprise must be separate and

distinct from the RICO persons that are operating or managing the enterprise.  *United States v.*

*Goldin Industries, Inc.*, 219 F.3d 1268, 1269-71 (11th Cir. 2000).  The plaintiff's allegations as

to several elements of a RICO "enterprise" are inadequate under these well-settled pleading

requirements.

At the outset, the plaintiff's complaints fail to identify what entities constitute the alleged

RICO "enterprise."  In conclusory fashion, the plaintiff alleges "an association between

defendants and the subcontractors for each project."  (Doc. 26 at p. 16).  Presumably, the plaintiff

alleges the existence of four distinct enterprises, as nowhere throughout any of the plaintiff's

pleadings does he allege any association among the individual general contractors.  Additionally,

the plaintiff does not specify which subcontractors the defendants have associated with to form

these alleged "enterprises."  Although notice pleading is the standard, the plaintiff's "conclusory

19

allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002) (citations omitted); *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1262 (11th Cir. 2004). The plaintiff has not given the defendants enough information to allow them to defend the claims against them.

Even if the plaintiff identified the entities which compromise the alleged "enterprise," in order to defeat a motion to dismiss, he "must do more than merely state legal conclusions" and must "allege some specific factual basis" to avoid dismissal. *Jackson*, 372 F.3d at 1263. A plaintiff must include sufficient factual allegations to raise a right to relief above mere speculation and to raise a reasonable expectation that discovery will reveal evidence of the plaintiff's claim. *Twombly*, 127 S. Ct. at 1965; *see also Jordan v. Scott Fetzer Co.*, No. 4:07-CV-80 (CDL), 2007 WL 4287719 (M.D. Ga. Dec. 4, 2007); *Danielson v. DMB, Inc.*, No. 1:05-CV-2091-WSD, 2006 WL 3246581 at *2 (N.D. Ga. Nov. 8, 2006).

Instead of providing sufficient factual allegations, the plaintiff only alleges that the subcontractors are known to regularly hire illegal aliens and that each of the defendants is "well aware of this conduct, and does absolutely nothing to prevent it" (SAC at ¶ 24) and that defendants are "happy to participate . . . because they are able to bid projects at a lower rate." (SAC at ¶ 40). The plaintiff goes so far as to say:

> There is little question that Defendants and the subcontractors are engaged in the common agreed upon purpose or overall objective of having illegal workers perform tasks at artificially depressed wages in order to make (more) money for both general contractors and subcontractors. Moreover, in this case specific knowledge of the illegal means by which the overall objective was achieved is alleged [sic].

> As such, the enterprise element of a RICO claim has been made out.  In
> Mohawk the Court found the enterprise requirement satisfied by the allegations of
> an agreement between Mohawk and third party labor recruiters that showed the
> common purpose of obtaining illegal workers for employment by Mohawk.
> Similarly, the defendant general contractors and the subcontractors share the
> common purpose of having illegal workers employed by the subcontracts [sic] to
> keep bids (both sub and general) low, but margins steady.  (SAC, ¶ 40).

(Doc. 26 at pp. 21-22).  However, the court finds the plaintiff's assertion to be entirely

questionable in view of the conclusory nature of the pleadings.  Moreover, the plaintiff's attempt

to align the defendants with *Mohawk* is misplaced.

Although the plaintiff has fashioned the substance of his RICO claims in his second

amended complaint precisely as the *Mohawk* plaintiffs fashioned their claims, the plaintiff

continues to overlook the fact that the *Mohawk* plaintiffs' allegations implicated Mohawk,

whereas the plaintiff's claims only implicate the subcontractors.  Specifically, the Eleventh

Circuit found there were specific factual allegations that Mohawk and third-party recruiters

conspired to violate federal immigration laws, destroy documentation, and harbor illegal workers

sufficient to establish an enterprise where the plaintiffs alleged, in part, that Mohawk paid fees to

the recruiters for each worker supplied to Mohawk and that Mohawk employees sometimes

assisted the recruiters and carried a supply of social security cards to help prospective employees

assume a new identity.  *Mohawk*, 465 F.3d at 1284.  The plaintiff herein simply does not make

any similar factual allegations about the defendants.  The Second Amended Complaint is devoid

of any factual basis for establishing that the defendants actively participated in an enterprise

distinct from their legitimate construction businesses.

## V.     CONCLUSION

For the reasons set out herein, the court finds that the plaintiff's motion to amend the complaint is due to be denied as the Second Amended Complaint is futile.  Even with the allegations as amended in the proposed Second Amended Complaint, the plaintiff's complaint fails to state a claim.  Therefore, the court finds that the plaintiff's amended complaint is due to be dismissed as to each defendant as the allegations contained therein are made with even less specificity than the Second Amended Complaint.[13]  An appropriate Order will be entered

---

[13]The defendants make an additional argument as to why the plaintiff's RICO claims against them fail - - the plaintiff lacks standing to pursue a RICO claim because he cannot identify a direct injury.  Specifically, the defendants argue:

> Neither Plaintiff nor any other claimant can establish proximate causation to support a class RICO injury.  In a civil RICO claim, a plaintiff "only has standing and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation."  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *see also Mohawk*, 465 F.3d at 1286-87 (11th Cir. 2006) ("[C]ourts should scrutinize proximate causation at the pleading stage and carefully evaluate whether the injury pled was proximately caused by the claimed RICO violations.").  One or more of the predicate acts must not only be the "but for" cause of the injury, but the proximate cause as well.  *See Danielson v. DMB, Inc.*, No. 1:05-CV-2091-WSD, 2006 WL 3246581 at *3 (N.D. Ga. Nov. 8, 2006).

> Plaintiff seeks to assert claims on behalf of all U.S. citizens who "applied for work at one of the four construction projects referenced herein, and were not employed, where any position applied for was filled by an illegal alien." (Am. Compl., ¶ 36).  Plaintiff seeks to recover "the Davis-Bacon prevailing rate for the duration of the time the job for which the applicant applied was filled by any person." (Am. Compl., ¶ 69).  Plaintiff's speculative claim for a lost employment opportunity fails as a matter of law because it is allegedly caused by overall market factors and not the actions of Defendants.  *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992) (stating that proximate cause is "used to limit a person's responsibility for the consequences of that person's own acts").

> In addition to the logical fallacy it would require to assume each applicant for work on these projects would have been hired, Plaintiff's alleged class injury of being "unable to procure employment" is admittedly due to the "flood of illegal workers [in the] labor market." (Am. Compl., ¶ 62).  There are countless market factors that would affect any applicant's ability to procure work, including but not limited to hiring practices at hundreds of other construction projects in the Birmingham area and the quality of other competing subcontract bidders on the UAB projects.  *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) (holding that a plaintiff cannot recover for lost business opportunity based on economic competitor's alleged RICO activity).

(Doc. 21 at pp. 29-30; *see also* Doc. 29 at pp. 15-20 for similar arguments made by Opus).  While the court declines to address this issue given the current posture of the case, the court does note that it appears that the plaintiff's injuries may be entirely too speculative to establish proximate causation.  As the defendants correctly point out, the cases in which plaintiffs in similar fact situations as those alleged in the second amended complaint have established proximate causation are cases where the plaintiffs are employees whose wages were affected by illegal aliens working for lower rates.  Because the plaintiff was never employed on any of the projects named in his complaints (with the exception of the UAB projects), it would be more difficult to show that the hiring of illegal workers was the proximate cause for his inability to be employed at any of the project sites.

contemporaneously herewith.

   **DONE**, this the 7th day of August, 2008.

_John E. Ott_
**JOHN E. OTT**
United States Magistrate Judge